POTTER v. PERE MARQUETTE RAILROAD CO.[1]

1. RAILROADS—CROSSING ACCIDENT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY—EVIDENCE.

In an action against a railroad company for the negligent killing of a person at a highway crossing, evidence examined, and *held*, insufficient to show that deceased did not listen as he approached the crossing.

2. SAME.

Plaintiff's intestate having been killed by a backing train while crossing the tracks on a bicycle very slowly, the questions whether the defendant was negligent, or the deceased was guilty of contributory negligence, were questions for the jury.

Error to Kent; Wolcott, J. Submitted May 3, 1905. (Docket No. 134.) Decided June 6, 1905.

Case by Stella M. Potter, administratrix of the estate of Henry Potter, deceased, against the Pere Marquette Railroad Company for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Frederick W. Stevens* (*Charles McPherson*, of counsel), for appellant.

*John W. Powers*, for appellee.

[1]Rehearing denied September 21, 1905.

MOORE, C. J. The following statement is taken from the brief of counsel for defendant:

"At Grand Rapids, Michigan, Fifth, Sixth, and Seventh streets run east and west; Fifth street being the most southerly, and Seventh street the most northerly, of the three streets. These three streets are crossed at right angles by the tracks of the Grand Rapids & Indiana Railroad Company and of the Pere Marquette Railroad Company. At Sixth-street the center of the Pere Marquette main track is 32 feet east of the center of the Grand Rapids & Indiana main track. Both main tracks are used by the two companies jointly; all north-bound trains going over the east or Pere Marquette track, and all south-bound trains going over the west or Grand Rapids & Indiana track. At the Sixth-street crossing there is one side track east of the main tracks and one side track west of the main tracks. Crossing gates are maintained at the Sixth-street crossing, and are operated by a gateman from a tower situated between the main tracks just north of Sixth street.

"On the morning of July 4, 1903, plaintiff's intestate was crossing defendant's track at Sixth street on a bicycle, when he was struck by a freight car which was being pushed across Sixth street by one of defendant's locomotives, and sustained injuries which resulted in his death a few hours later. It was a bright, clear morning, and the accident occurred about nine o'clock. As he approached defendant's track one of defendant's freight trains was moving south across Sixth street on the west main track. The rear end of that train had just crossed Sixth street when he was struck by the car moving north on the east main track. As he approached defendant's track the crossing gates were up, and they remained up until after the accident. The locomotive and cars by which he was struck were moving at the rate of 15 to 20 miles per hour —a rate of speed greater than that permitted by the ordinances of the city—and the bell on the locomotive was not ringing, as required by the ordinances of the city.

"As Mr. Potter approached defendant's track from the east on Sixth street, his view of cars approaching Sixth street on defendant's track from the south was entirely obstructed by lumber piles and a warehouse until he was 29 feet east of the east rail of the track upon which he was struck. When he was 29 feet east of the east rail

of the track upon which he was struck, by looking over a platform 4 feet high and 7½ feet wide, between the warehouse and the box car standing on the side track west of it, he could see the east rail of the main track upon which the car by which he was struck was approaching 120 feet south of the center of Sixth street, and he could see the west end of the box car approaching on that track 147 feet south of the center of Sixth street. While he was traveling along Sixth street from a point 29 feet east of the east rail of the main track to a point 21 feet east of the east rail of the main track, or a space of 8 feet, he could look over a platform between the warehouse and the box car on the side track and see defendant's main track south of Sixth street, except that portion of the main track of which his view was obstructed by the box car. The box car on the side track stood with its north end even with the north edge of the sidewalk on the south side of Sixth street, and about 26 feet south of the center of Sixth street. From a point 7.3 feet east of the east rail of the main track he could see a box car on the main track 140 feet south of the center of Sixth street. From a point 6.3 feet east of the east rail of the main track he could see a box car on the main track 300 feet south of the center of Sixth street. From a point 5.3 feet east of the east rail of the main track his view of cars approaching on that track from the south was entirely unobstructed. Before Mr. Potter could get a complete view of the main track, he would have to be 2 feet west of the west rail of the side track; considering that the box car extends 2 feet over the rail, or 5.3 feet east of the main track. A man on a bicycle would not get a view of the main track to the south of Sixth street until the front wheel of his bicycle was 2 feet from the main track. * * *

"At the request of the defendant the jury returned with their verdict the following special findings of fact:

"1. Did plaintiff's intestate, Henry Potter, look to see if there was a train of cars approaching from the south before riding upon the track where he was struck and killed?

"A. No.

"2. Did plaintiff's intestate listen to learn if there was a train approaching from the south before riding upon the track where he was struck and killed?

"A. Yes.

"3. Did plaintiff's intestate rely entirely upon the fact

that the safety gates were up, as an assurance that he could cross defendant's track in safety?

"*A.* Yes.

"4. Did plaintiff's intestate either stop to look or listen to learn if there was a train or cars approaching on defendant's track from the south at any time after he was within seventy-five feet of the place where he was struck?

"*A.* Yes.

"5. If plaintiff's intestate had looked for a train approaching from the south before riding upon defendant's track, could he have seen the approaching cars in time to have avoided the accident?

"*A.* No."

The judgment was in favor of plaintiff. Counsel say:

" The assignments of error upon which defendant relies relate solely to the right of plaintiff's intestate to rely entirely upon the fact that the safety gates were up, as an assurance that he could cross defendant's track in safety. * * *

"The special finding of the jury that plaintiff's intestate listened to learn if there was a train approaching before riding upon defendant's track is inconsistent with their other special finding that he relied entirely upon the safety gates as an assurance of safety, and is not supported by a scintilla of evidence."

They ask the court to render a judgment here in favor of defendant on the special findings.

Counsel argue at great length for the following proposition:

" The maintenance of gates, gongs, or other devices at street crossings to warn travelers of approaching trains does not excuse travelers from exercising ordinary care for their own safety, and it is negligence, as a matter of law, for a traveler to rely entirely upon open gates, or the absence of any other customary warning, as an assurance that he can cross in safety. It is the duty of the railroad company to lower the gates upon the approach of a train, but the traveler must not rely entirely upon the performance of this duty by the servant of the railroad company;" citing authorities.

In our view of the case, it is not necessary to enter upon a discussion of that proposition. In response to a question

put to the counsel upon the oral argument, asking if the answers to special interrogatories 2 and 4 did not modify the answer to special interrogatory 3, counsel frankly replied thèy did, if there was any evidence upon which to base them, but insisted there was no such evidence. We do not feel so clear about there being no evidence upon which to base these answers as does counsel. Several witnesses testify that, if plaintiff had looked, he could not have seen the train in time to have avoided the accident. The witnesses could not very well testify whether the plaintiff listened for the train. They could only describe his manner and what he did, his surroundings and what occurred. No one testified he did not listen, but it is said that five of plaintiff's witnesses who were at Seventh street heard the whistle at Fifth street, and that they were twice as far from the locomotive as was plaintiff's intestate. It should not be forgotten that Mr. Potter was approaching from the east on his wheel, and when this train was at Fifth street he was probably in the neighborhood of 150 feet from the place of the accident, and not only could not see to the south, but his ability to hear was lessened by the large lumber piles intercepting the sound, while the witnesses had a clear, open space. This does not demonstrate he was not listening. See *Kimball* v. *Friend's Adm'r*, 95 Va. 125.

The evidence discloses plaintiff was riding his wheel very slowly—not faster than a man would walk. One of the witnesses testified in part as follows:

" When I first saw the gates they were up, and they remained up all the time. Mr. Potter was looking a little downward, with his face straight ahead of him, without turning to look to either side. He appeared to be looking kind of down, ahead of him, at the ground right in front of his wheel. The conductor and brakeman were on top of the car which struck him. Standing up. They were about in the center of the car. I heard some one call to Mr. Potter. When they called to Mr. Potter it seemed as though he looked up, and the train hit him. They called to him twice. He did not appear to hear them the first

time they called.   When they called the first time, his front wheel was right on the east rail of the main track, and when they called the second time he was right in the center of the main track.   When the whistle blew, the box cars were just about on Fifth street.   The engine whistled three times.   The engine was about on Fifth street when it ceased to whistle.   I heard the whistle before I saw Mr. Potter.   The whistle sounded three short, sharp whistles, such as are ordinarily given for a crossing. I don't think Mr. Potter could have stepped off and saved himself if he heard the conductor when he called to him the first time."

We think, in view of this and other testimony, it cannot be said there was no case for a jury.

Judgment is affirmed.

CARPENTER, MCALVAY, BLAIR, and HOOKER, JJ., concurred.