WILBUR v. MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS — PERSONAL INJURIES — CROSSING ACCIDENT — CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

   In an action against a railroad company for personal injuries sustained in an accident at a highway crossing, evidence examined, and *held*, that plaintiff's husband, who was driving, was not, as a matter of law, guilty of negligence imputable to plaintiff in failing to stop his horse at a point where the horse's head would have been within 10 or 12 feet of where it would have been struck by the passing train. MCALVAY, GRANT, and BLAIR, JJ., dissenting.

2. APPEAL AND ERROR—NEW TRIAL—REFUSAL—REVIEW.

   Alleged error in refusing a motion for a new trial cannot be reviewed under section 10504, 3 Comp. Laws, where the record does not contain any statement of the reasons which actuated the trial judge in refusing the new trial on one of the grounds on which the motion was based.

Error to Oakland; Smith, J. Submitted October 13, 1905. (Docket No. 62.) Decided July 23, 1906.

Case by Myrta Wilbur against the Michigan Central Railroad Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*John H. Patterson*, for appellant.
*Andrew L. Moore*, for appellee.

MOORE, J. The plaintiff was injured where the highway crosses defendant's railway track. She claimed the defendant was negligent, and sued the defendant. The case was tried by jury. The plaintiff recovered a judgment in the sum of $3,000. The case is brought here by writ of error.

The important question in the case is whether the judge should have directed a verdict in favor of defendant, because

the husband of plaintiff, with whom she was riding at the time she was hurt, was guilty of contributory negligence. The injury occurred soon after 6 o'clock p. m. October 23, 1903, at a highway crossing north of Oxford. The highway runs north and south. The railway track runs west of north and east of south where it crosses the highway at an acute angle. The plaintiff and her husband were going north. It is their claim that a train approached them running at a rapid rate of speed from the south; that the statutory signals for the crossing were not given, and while in the exercise of due care upon their part, the injury occurred. The defendant claims the statutory signals were given; that if the husband of the plaintiff had looked and listened as it was his duty to do he would have seen and heard the train in time to avoid the accident. Testimony was given in support of each of these claims. There is testimony that south of the railroad right of way there are obstructions on the east side of the highway for a considerable distance, which would obstruct the view of a train coming from Oxford.

The husband of plaintiff after describing the approach to the crossing, the narrowness of the highway, the trees, buildings, and other obstructions that would prevent seeing an approaching train, among other things testified as follows:

"To a certain extent I knew before the accident there were obstructions to the view, but as to where the exact points of vision were cut off, I could not say. I was present after the accident when an effort was made to estimate how far south of the crossing you could be, and still get a view down the railroad right of way. I knew these obstructions were here at the time of the accident, and I knew the orchard was here, and I knew they obstructed the view. On the day the test was made to estimate how far south of the track you could be and still see a train coming or see up the right of way, if I remember right, it was somewhere between 19 and 21 feet. We made the test with the rig, and by measurement. If I remember right you would have to be closer in a rig than you would on the ground.

"*Q.* The night of October 23d, as you approached the crossing what, if anything, did you do with reference to ascertaining whether or not the train was coming?

"*A.* I stopped my horse, and looked, and listened.

"*Q.* How did you look, in what way?

"*A.* I leaned forward in the rig, and looked around the side curtain of the buggy.

"*Q.* And how far were you from the track when you stopped?

"*A.* 35 or 40 feet, in my judgment.

"*Q.* You could see up the line, track, could you not— the cattle guards?

"*A.* Yes, sir.

"*Q.* How long did you remain with the horse still?

"*A.* Not over a quarter of a minute.

"*Q.* Just a few seconds?

"*A.* Yes, sir.

"*Q.* And then what did you do?

"*A.* I started the horse. I had driven the horse before, and had driven it around the cars. It was very afraid.

"*Q.* As you drove on towards the crossing, 35 or 40 feet, whatever the distance was, what, if anything, did you do during that period of time to discover whether a train was coming or not?

"*A.* I continued to look.

"*Q.* How?

"*A.* By leaning forward and looking around the curtains of the buggy.

"*Q.* What was the first intimation that you had that a train was there?

"*A.* I saw the gleam of the light strike the horse.

"*Q.* Do you know whether or not the horse at that time was on the track?

"*A.* I believe the feet of the horse were on the rail.

"*Q.* Well, what do you know about what happened after that?

"*A.* I don't remember anything until I was on the train.

"*Q.* Was there a flagman stationed at that crossing on the night in question?

"*A.* I did not see one; no, sir.

"*Q.* And there was no alarm or signal bell to warn you that night?

"*A.* I didn't see any, and didn't hear any.

"*Q.* What evidence did your horse show, if any, that it had either seen or heard the approaching train?

"*A.* It gave no sign whatever. After the accident, the first thing I remember was being on the train."

On the cross-examination he testified, among other things: ·

"*Q.* Now, could you illustrate just what position you were in when you were continuing to look after you started up your horse?

"*The Court:* That is a pretty hard supposition for him in the court-room.

"*Q.* Then I will ask you this question: You were about half out of the buggy weren't you?

"*A.* My head and shoulders would be over the edge of the buggy.

"*Q.* You were in that way looking southeast and you would necessarily have to get around like this here (illustrating to witness).

"*A.* Yes, sir.

"*Q.* And in order to do that you had to get up in the buggy, did you not?

"*A.* Yes, you would have to raise in the buggy.

"*Q.* You would have to raise up in the buggy; you were standing on your feet?

"*A.* Partly.

"*Q.* Partly?

"*A.* Yes, sir.

"*Q.* And looking around in that direction?

"*A.* Yes, sir.

"*Q.* Do you mean to say that you continued in that position?

"*A.* Yes, sir.

"*Q.* How long?

"*A.* Until I reached the point of the track.

"*Q.* What do you mean?

"*A.* Until I was struck.

"*Q.* And looking in that position all of the time, driving the horse, were you?

"*A.* Yes, sir. Don't remember which hand I was driving with.

"*Q.* Well, continuing in that position, partly upon your feet with your head and shoulders in front of the top and looking southeast, you continued to drive the horse on a walk across the track, did you?

"*A.* I didn't get across the track.

"*Q.* No, but you started to go across?

"*A.* Yes, sir.

"*Q.* And the horse was on a walk all the time?

"*A.* Yes, sir.

"*Q.* Yes, and continuing to look in that position did you see that train?

"*A.* No, sir.

"*Q.* When did you see the train?

"*A.* I saw the light strike right in my face when I got on the track. The horse was on the track. I was not quite on the track, the rig was in the right of way, in my judgment.

"*Q.* You were looking all of the time?

"*A.* Yes, had been.

"*Q.* And continued to look in the southeast direction up to the time you saw the light on the horse?

"*A.* Yes, sir.

"*Q.* You didn't see a headlight?

"*A.* Yes, sir.

"*Q.* You didn't see it except as the light struck the horse?

"*A.* It struck me in the face.

"*Q.* How far was the buggy at that time, according to your best judgment?

"*A.* Well, I didn't have any judgment after I saw that light.

"*Q.* You are unable to tell what you did after you saw the light?

"*A.* Yes, sir."

His wife corroborated his testimony. She was sitting on the left hand side of the buggy, and testified that after her husband started the horse after the stop was made, she continually looked through the window in the back curtain in the direction from which the train would come, and heard and saw nothing indicating its approach until the horse was on the right of way.

Mr. Skillman, whose farm is located about a mile north of this crossing, testified:

"My attention has been called to how close you must get to the crossing to get a view of an approaching train from the south, and I have made an examination to ascertain how close you must be to the crossing before you can see down the right of way, and see a train. That

distance is 7 paces from the south rail south; at a distance of 7 paces south from the south rail you can see down here by Lett's house. They were ordinary paces, possibly 21 feet. That is sitting in the buggy, you possibly could see further standing on the ground, because when you are in the buggy you would be looking into these trees along here. You cannot see a train approaching looking under those trees unless the leaves are all off from the trees, then you might possibly see better that way. In the 30 rods from Fuller's house to the crossing, driving north there is approximately 100 feet that you get a view of the track until you reach a point about 21 feet from the crossing. The view is completely shut off of an approaching train from the south between Fuller's house and the point 21 feet south from the crossing, except for this 100 feet approximately, when the leaves are on the trees."

On the cross-examination he testified:

"A. May 20, 1904. At that time I think the leaves were all out on the trees and I could just see by Lett's house at a distance of 21 feet away, sitting in a buggy with my horse headed north. My position in the buggy was 21 feet south from the south rail. My estimate of the distance, I could see down the track from that position 21 feet from the track, is 10 or 12 rods; have never made that test since that time."

The trial of this case commenced February 13, 1905. Benjamin Gardner, upon whose farm the crossing is where the accident happened, after describing the condition of the road south of the crossing, and the obstruction on the east side thereof, stating a pace is calculated to be three feet, testified:

" Q. Did you make any examination to ascertain how far south of the crossing you could be and still get a view down the track of an approaching train?

"A. I paced it. I made it 7 paces from the south rail in the traveled portion of the highway. I made the test last Friday. There were no leaves on the trees at that time. I was in a cutter; never tested it before; never paced it before.

" Q. Have you ever made any test?

"A. Yes, I made a calculation in the summer time with a buggy. I would drive up and would look, then I would drive a little further, and see how near I could get to the

railroad track before I would see it, and then I made an estimate as to how far it was from the horse's head to the track."

He also testified that "when the leaves were on, you would have to be still nearer the track before you could see the approaching train." There were other witnesses who gave like testimony. There were upwards of a dozen witnesses sworn upon each side.

We have the question, then, before us whether it can be said, as a matter of law, that because at a point 21 feet south of the south rail the observer could see in the daytime (when he was there for the express purpose of seeing how far away he could see an approaching train), one could see it as some of the witnesses say, 12 or 15 rods, and others say perhaps 40 rods, that the husband of the plaintiff was guilty of contributory negligence, which may be imputed to her, because upon a cold, stormy night he did not, at this point, stop his horse and avoid the accident. Account should be taken of the fact that some men do not think as quickly as others. It should not be forgotten that the horse was afraid of the cars. At this point his head was within 10 or 12 feet of where it would be struck by a passing train, a trying situation indeed for both driver and beast. I am not prepared to say that under such circumstances we can say, as a matter of law, the husband was guilty of contributory negligence, because he did not then stop his horse and avoid the accident. The question presented is not one of law, but is one of fact, namely: Did the driver do what a reasonably prudent person would have done under like circumstances? The circuit judge in a very fair and impartial charge left the question to the jury. See *Potter* v. *Railroad Co.*, 140 Mich. 362; *Monroe* v. *Railway Co.*, 129 Mich. 309; *McDuffie* v. *Railway Co.*, 98 Mich. 356; *Richmond* v. *Railway Co.*, 87 Mich. 374; *Haines* v. *Railway Co.*, 129 Mich. 475; *Hintz* v. *Railroad Co.*, 140 Mich. 565.

It is said the verdict is against the weight of evidence and for that reason a new trial should have been granted.

We do not think the record is in a condition to present that question, briefly stated, for the following reasons: A motion was made for a new trial, among other reasons because the verdict was against the weight of evidence. No request was made of the circuit judge that he file his reasons for doing so, if he refused a new trial. He did not file any reasons. Later a petition was filed asking for leave to file another motion for a new trial, because of newly discovered evidence. The petition was granted. Another motion for a new trial was made for the following reasons, to wit:

"*First.* Because of each and all of the reasons set forth in the motion for new trial heretofore filed.

"*Second.* Because of the discovery of new evidence the nature and application of which is more fully set forth in the affidavits of William C. Rugenstein and Alice Rugenstein hereto attached."

The judge was requested, if he overruled the motion, to file his reasons for doing so. The judge filed his reasons for refusing the new trial. He apparently treated the motion as one made upon the ground of newly discovered evidence. In the reasons he gave for refusing a new trial, he referred to the newly discovered evidence, and no reference was made to any reason relating to the question of whether the verdict was against the weight of evidence. He was not requested to make a further finding relating to that question, but counsel contented himself with taking exceptions to the reasons given for denying the motion for a new trial. The record does not contain any statement of the reasons which actuated Judge Smith in refusing a new trial because the verdict was against the weight of evidence. The statute relating to this subject is section 10504, 3 Comp. Laws. It has been construed in *McRae* v. *Lumber Co.*, 102 Mich. 488; *Finley* v. *Widner*, 116 Mich. 679; *Stevenson* v. *Railway Co.*, 118 Mich. 651.

The judgment is affirmed.

CARPENTER, C. J., and MONTGOMERY, J., concurred with MOORE, J. OSTRANDER and HOOKER, JJ., concurred in the result.

MCALVAY, J. (*dissenting*). Plaintiff recovered a judgment for personal injuries received at a certain public highway crossing on defendant's railroad in Oakland county, known as "Gardner's Crossing." The injury occurred on the evening of Octobor 23, 1903, between 6 and 7 o'clock. It was after lights were lighted in the houses in the vicinity; but was not so dark that one could not see where he was. It was quite cold, and the wind was blowing from the north. Plaintiff with her husband, who was driving, were on their way home from the village of Oxford. They were riding in a single buggy with the top up and the side curtains on. There was a glass in the back curtain. Both plaintiff and her husband were well acquainted with this crossing, having passed over it very many times, and knew it was a dangerous one. The highway runs north and south and the railroad crosses it at a very acute angle, being located quite near on the east side of the highway for a considerable distance south of the crossing. These parties were driving north. On the right hand side of the highway going north there are two houses with outbuildings and orchards, which at places obstruct the view to the railroad. Between these premises going north from the one farthest south of the crossing, is an open unobstructed space of about 100 feet, giving clear view of the railroad. After passing this space the ground rises up to the house nearest to the crossing, and then descends about 4 feet gradually to the crossing. This house with shed and orchard occupies the narrow triangular piece of land between the railroad and highway with the point where they intersect each other. These premises are higher than the highway, and with buildings and orchard obstruct the view of the railroad entirely in some places, and at others to a greater or less extent—whether completely or not up to defendant's right of way is in dispute. As these parties approached the crossing, and when within from 35 to 40 feet of it, they stopped, looked, and listened. The testimony of the plaintiff and her husband shows that she looked through

the glass in the back of the buggy top, and her husband looked out of the side, putting his head and shoulders out, looking toward the southeast for any train that might be coming. They did not look in any other direction. They knew it was about time for the train to go north, but thought it had passed. Not hearing or seeing anything, they proceeded with the horse at a walk, continuing to look all the time in the direction and manner described, the husband rising somewhat out of the seat; neither of them saw or heard anything until the horse was on the track, when the headlight flashed in the man's face and they were struck and injured. No other person saw the accident. The train which caused the injury was the regular evening passenger train going north, which was about 8 minutes late at the village of Oxford, and was running about 45 miles an hour. The negligence charged against defendant is in operating a train at a high rate of speed; and failure to give any warning of its approach; also in maintaining the crossing in a dangerous condition on account of the obstructions caused by the adjoining property and the buildings and trees thereon. Much of the evidence offered by both parties in the case was upon the question of the nature and extent of the obstructions to the view of the railroad south of the south line of defendant's right of way. There was no serious claim made that these obstructions extended farther north than that point. Plaintiff's husband, after the accident, when the leaves were on the trees, made a test as to where the view became unobstructed, and testified that he found an open view for at least 40 rods at a point 21 feet south of the south rail. The record shows that this point is about at the line of the right of way.

Defendant requested the court to direct a verdict on the ground that the failure to see the approaching train was due to plaintiff's negligence and the negligence of her husband which contributed to the accident, and also that the testimony that the required signals were given was conclusive. This request was refused. After this mo-

tion was denied, at defendant's request the court charged the jury:

"The testimony of the plaintiff's husband is that there was an unobstructed view of the track for at least 40 rods at a point about 21 feet south of the south rail on the occasion he made a test after the accident while the leaves were still on the trees and if you find from this testimony and the other evidence in the case that the plaintiff's husband could have seen the train at the point of the accident if he had looked for it, then your verdict must be for the defendant of no cause of action."

This request was given, being included in the general charge of the court, and the case was submitted to the jury. Two motions for a new trial were made and denied. The grounds for said motions were that the verdict was against the weight of evidence; that the court erred in submitting the question of the plaintiff's contributory negligence to the jury; and on account of newly discovered evidence. The material errors assigned are based upon the refusal to instruct a verdict for defendant on the ground of contributory negligence of plaintiff and the refusal to grant a new trial for the reasons stated.

This case depends solely upon the question as to whether there was contributory negligence on the part of the plaintiff, as a matter of law. All the other questions were disputed questions of fact, and were properly submitted to the jury by the trial judge in an admirable charge. As stated by the court, plaintiff's husband testified that, in a test made by him after the accident, while the leaves were still on the trees, at a point 21 feet south of the south rail of the track, there was an unobstructed view of the track, in the direction from which this train approached, of at least 40 rods. His testimony is as follows:

"Q. Did you measure 21 feet along the track in the traveled roadway?
"A. We did.
"Q. You were measuring the distance, you were out in the highway where you could see up the track, weren't you?

" *A.* Why, yes, sir.

" *Q.* You made a test of it ?

" *A.* Yes, sir.   *   *   *

" *Q.* At the time you made the test as to how far you could see up the track there, what is the shortest distance you are willing to say you could see up the track from the crossing ?

" *A.* I don't understand.   (Question repeated.)

" *A.* How many rods up the track ?   I couldn't say.

" *The Court :* Standing 19 or 20 feet away from the rail.

" *A.* I just said, I was unable to say.

" *The Court :* Can't you give some idea whether it was one rod or 100 ?

" *A.* Possibly you could see 100 rods up there.

" *The Court :* He is asking you for the shortest distance, you feel safe, you could see.

" *A.* I possibly could see 40 rods up there and possibly more.

" *Q.* Is it your best judgment that you could see 40 rods up the track from a position 19 or 20 feet south of the south rail in the traveled portion of the highway at Gardner's crossing ?

" *A.* I thought that I might.   That would be my judgment."

This is an intelligent witness.   He was the husband of plaintiff, and was driving the horse at the time of the accident.   He testified that he was leaning with his head and shoulders out all the time from the time they started up after stopping until they were struck, looking in the direction from which this train was coming.   The horse was proceeding at a slow walk.   The headlight on the engine was burning brightly.   He knew the crossing to be difficult and dangerous.   He had crossed there numerous times, and knew all the surroundings.   The testimony of this witness, above quoted, and its bearing upon the question of plaintiff's contributory negligence, is not considered in appellee's brief; but the claim is that, having performed the duty of stopping, looking, and listening at a point 40 feet from the track, and seeing and hearing nothing, these parties then proceeded as they had a right to do under numerous decisions of this court, which

are cited, and the question of contributory negligence is one of fact and not of law. The cases relied upon are: *Potter* v. *Railroad Co.*, 140 Mich. 362; *Monroe* v. *Railway Co.*, 129 Mich. 309; *McDuffie* v. *Railway Co.*, 98 Mich. 356; *Richmond* v. *Railway Co.*, 87 Mich. 374; *Haines* v. *Railway Co.*, 129 Mich. 475; *Hintz* v. *Railroad Co.*, 140 Mich. 565. These cases are all easily accessible and it will not be necessary to digest them in this opinion. It will be sufficient to say that all of them are distinguishable from the case at bar in that as to all the vital questions at issue there was either a dispute as to the facts, or where an opportunity was offered for the injured party to discover and avoid a train it was so limited that a failure to do so was not held to be negligence as a matter of law.

In the case at bar at a point 19 or 20 feet from the rail there was at least 40 rods of unobstructed view up the track upon which this train was approaching with a brilliant headlight towards which plaintiff's husband says he was looking all the time, and saw nothing. The conclusion is irresistible that he was not looking as he claims. In an Iowa case the court uses this language:

"But it is urged by the appellee's counsel that the plaintiff testifies that he did both look and listen to see and hear the train, but did not, and that this testimony shows that he was not guilty of contributory negligence, or, at the very least, it made that a question of fact for the jury. The difficulty, however, with the position is that the conceded or undisputed facts being true this testimony cannot, in the very nature of things, be also true. It constitutes, therefore, no conflict." *Artz* v. *Railroad Co.*, 34 Iowa, 153.

In a recent Wisconsin case that court said:

"Where a physical situation renders the right of a matter clearly beyond all reasonable controversy, there is no accounting for testimony to the contrary, except upon the theory of mistake or willful false swearing, and in such circumstance the more positive and definite the testimony the greater the indication of fault, greater than can

be reasonably attributed to mere mistake. In such a case, regardless of the amount of evidence from the mouths of witnesses, there is no conflict to be solved by a jury, because no just verdict can ever be rendered contrary to all reasonable probabilities." *Marshall* v. *Railroad Co.*, 125 Wis. 96, 100, and cases cited.

The facts in this last case are very similar to those in the case at bar, the material difference being the greater distance from the track the view was unobstructed. This case can be, and is, determined upon the testimony of plaintiff's husband, without taking into consideration all of the other corroborating testimony in the case upon the physical conditions as to the view at the crossing. With the unobstructed view of at least 40 rods, and, from his testimony, probably much farther, at a point where from his familiarity with the crossing he must have known he could get this view, we cannot say, as was said in the case of *Hintz* v. *Railroad Co.*, supra, he had a very limited opportunity to discover the approaching train. He would have seen the train had he used ordinary prudence and caution and avoided the accident. Not to do so was negligence, and his negligence must be imputed to the plaintiff. The court erred in not instructing a verdict for defendant. This disposes of all the other errors assigned in the case.

The judgment of the circuit court should be reversed, and a new trial ordered.

GRANT and BLAIR, JJ., concurred with McALVAY, J.