ELIZABETH VAN AUKEN v. THE CHICAGO & WEST MICH-
IGAN RAILWAY COMPANY.

*Railroad companies—Injury at crossing—Running engine without headlight—Contributory negligence—Special questions—Traveling on Sunday.*

1. Whether or not a traveler who is injured upon a railroad crossing in the open country on a dark night, by a train running without a headlight, is guilty of contributory negligence in failing to stop his team before entering upon the track, in order to listen for an approaching train, is at least a question for the jury, his view of the track being unobstructed other than by the darkness.

2. Where, under the evidence, there can be but one answer to a special question, it is not error for the court to direct the jury to give that answer.[1]

3. In nearly all the states it has been held, under statutes quite similar to our Sunday statute, that a party traveling upon the highway upon the Sabbath, either from necessity or for pleasure or business, who is injured by a collision with a railway train at a crossing, is not barred from recovery against the company for its negligence from the fact that the injury occurred on Sunday.

Error to Van Buren. (Buck, J.) Argued November 30, 1892, and reargued January 4, 1893. Decided June 30, 1893.

---

[1] See *Cousins v. Railway Co.*, 96 Mich. —, and note.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Smiley, Smith & Stevens,* for appellant.

*George W. Merriman* and *Boudeman & Adams,* for plaintiff.

MONTGOMERY, J. The question of most importance involved in this case is that of the contributory negligence of the driver of plaintiff's vehicle when they approached the crossing where the accident occurred. The scene of the accident is indicated by the diagram appended to the opinion of Mr. Justice GRANT. The highway and the railroad do not meet at right angles, so that in traveling from the east towards the railway track the view would not be directly in the face of an approaching train. The night when the injury occurred was very dark. The evidence shows that when approaching the crossing the horses were on a walk. No stop was made for the purpose of listening, but the driver and those in the vehicle testified that they looked for an approaching train, but saw none, and that they listened and did not hear any signal. The engine was running backward, and the testimony is conflicting as to whether there was any light at the rear end of the cab. The question presented is whether it was the duty of the driver, under the circumstances, to bring his team to a stop in order to listen for an approaching train.

Our decisions have settled the law as follows:

*First.* A railroad track is, in and of itself, a warning of danger, calling upon one about to cross to use his senses, and to look and listen for approaching trains. *Lake Shore & M. S. R. R. Co. v. Miller,* 25 Mich. 274.

*Second.* It is not incumbent in all cases for the driver to stop his team, if the track is clear, and he can safely rely on his sense of sight. *Guggenheim v. Railway Co.,*

66 Mich. 158; *Thomas v. Railway Co.*, 86 Id. 504; *Richmond v. Railway Co.*, 87 Id. 380.

*Third.* As to whether, in a particular case, the driver is justified in relying upon his sense of sight alone, must, we take it, depend upon the circumstances of the case presented.

No case precisely analogous to the one under consideration has been decided by this Court. In *Mynning v. Railroad Co.*, 64 Mich. 93, it appeared that on a dark and stormy night the deceased was killed while crossing the track, under circumstances which showed conclusively the negligence of the railroad company; that he was acquainted with the railroad crossing at the street in question; that he walked at a rapid pace towards and upon the railroad track, without checking his speed, or stopping or looking or listening, or taking any precaution whatever, to ascertain whether a train was about to pass; that others who were about to cross, whose opportunities for observation were no better than those of deceased, saw and heard the train. Mr. Justice CHAMPLIN, in rendering the opinion of the Court, said :

" Ordinary care would have required him to at least look up and down the track before crossing; and, if the night was so dark as to make it difficult to distinguish a train approaching, then ordinary care would have called upon him to resort to his sense of hearing, and to pause, if need be, and listen, before entering upon the place of danger."

In *Brady v. Railroad Co.*, 81 Mich. 616, it appeared that the driver of the vehicle was familiar with the crossing; that the railroad track, for some distance before crossing the highway, runs through an orchard; that the trees coming near the surface of the ground, together with other trees and bushes there, partly obscured the view of persons going southward of any train going to the southeast. The track crosses the highway obliquely. The highway extends from north to south, and the track runs in a

north-westerly and south-easterly direction.  It appeared that the plaintiff, sitting on the hounds of his wagon between the two hind wheels, drove upon the track without stopping, although he testified that he looked in both directions.  The Court held as matter of law that he was guilty of contributory negligence.  In the opinion Mr. Justice LONG states:

"The circumstances stated by the plaintiff himself show conclusively that he was not using ordinary care in approaching the crossing.  Here was a crossing so much obstructed · by intervening objects that, according to his testimony, he could not see a train coming · from that direction—riding, as he was, upon the hounds of his wagon—until he was within 20 or 25 feet of the crossing, and then only a little distance up the track,—some few rods.  He was riding with his back turned in the direction from which the train was approaching, and he knew that it was about time for its approach; and yet he drove along and upon the track without stopping; and even when his horse halted on reaching the track he urged her forward with the lines.  * * *  It was shown further that there was a mill near the crossing, which was in operation, and creating some noise and confusion.  Others standing near there saw the train approaching, and had heard the sounding of the whistle at the crossing above.  Some of them attempted to call the attention of the plaintiff to the train's approach, but were unable to do so, as he appeared to take no note of what was passing.  As the facts are presented by this record, it was the duty of the plaintiff to have stopped his team, and to have taken some precaution to ascertain if the train was approaching, which he knew was about due."

And further, it was said :

"A greater duty was imposed upon the plaintiff in the present case by the fact that he knew the crossing to be a dangerous one.  He knew its condition, and that he would be unable to see the train until arriving at the crossing.  He had no right to close his ears, and drive along without stopping, when he must have known that the noise of his wagon and of the mill would shut off the sound from the approaching train."

In the present case there was no obstruction other than

the darkness, which, of course, would not have prevented the plaintiff and her companions from seeing a headlight. The sense of sight was therefore as safe a guide as in the daytime, unless it be held that travelers are guilty of contributory negligence as matter of law in not anticipating that trains will be run in the open country without headlights. We think the law ought not to be so. It is most unusual and extraordinary for this to occur. And we think it should be at least a question for the jury as to whether a traveler is in fault in failing to anticipate and guard against such an unusual thing as the running of a train without a headlight. The case might be different in a yard where switching is done, and where cars are switched in the nighttime without the use of a headlight, as was the fact in the Mynning case.

Exception is taken to the language of the court in that portion of the charge where it is said:

"The blowing of the whistle and the ringing of the bell a mile away from a crossing would, of course, give no warning to people about to cross a railroad track."

The court added this:

"The object of it is to warn people who cross the railway track that a train is approaching, so that the warning should be given within such a reasonable distance as would fairly notify people who are about to cross the track of the approach of a train."

We think there was no error in this part of the charge, when read in connection with the whole charge, and when it is considered in the light of the request of defendant's counsel which had been given by the court immediately preceding, as follows:

"The law requires of a railroad company that it cause the whistle to be blown not less than 40 rods from the crossing. It is not required to be blown within 40 rods of the crossing, nor within any other distance except a reasonable distance."

The court added to this :

"The law does not require 'the whistle to be blown within the 40 rods, nor does it specify the exact distance at which the whistle shall be blown and the train hands begin ringing the bell. That distance, however, should be a reasonable one. It must be more than 40 rods, but it would have to be a reasonable distance."

It must be remembered that preceding this charge the court had already directed the jury that, if the whistle was sounded at St. John's crossing, and the plaintiff and her party could have heard it by remaining quiet and listening, and they were at such a point that it was their duty to remain quiet and listen at the time, they would be guilty of contributory negligence if they did not hear it. It is evident from this that the court was calling the attention of the jury merely to what would be a reasonable distance under the statute which requires the whistle to be sounded. We see no error in that part of the charge.

Counsel for defendant requested the court to charge as follows:

"It does not appear from the testimony of the plaintiff herself that she looked and listened for a coming train when the vehicle in which she was riding was approaching the track; and, as she was more familiar with the locality than her driver, and as she has the burden of proving her personal freedom from contributory negligence, and as she was bound herself to look and listen for a coming train, she has not shown her personal freedom from contributory negligence, and she cannot recover in this action."

The plaintiff was called as a witness, and testified that she could remember nothing except going to Hartford and starting homeward. She was injured in her back, and her limbs paralyzed, so that she was unable to walk, and a great share of the time since the injury she had been entirely helpless. The last recollection, she testifies, she has was the party leaving Hartford going towards home,

and that it was a dark night. The witnesses called in her behalf, who were her companions in the buggy in which she was riding, however, testified that before they reached the crossing, and at some point which is not very definitely fixed, the plaintiff did look, and was apparently listening to see if she could hear the approach of a train. We think there was some evidence from these witnesses proper to be submitted to the jury upon the question of her due care in approaching the crossing, and that the jury, under the general charge of the court, were fully and fairly instructed upon this branch of the case, and the rights of the defendant fully guarded.

Counsel for the defendant requested the court to submit the following special questions of fact to be found by the jury:

1. Did the train in question make a rumbling noise as it passed over the bridges before reaching the place of the accident?

2. If the driver, Cavanaugh, had been listening for the coming train as he drove towards the track, could he have heard the train in question as it crossed the bridges?

3. Was there any noise which prevented plaintiff and her party from hearing the approaching train when they were within 100 feet from the track?

4. Was the whistle blown at all after leaving Hartford, and before the place of the accident?

The court submitted the first three questions. To the first the jury answered, "Yes;" and to the second and third answered, "No." The fourth question the court refused to submit to the jury, but directed them to answer "Yes," which they did. It is contended upon the part of defendant that the direction of the court to answer "Yes" was prejudicial to the rights of the defendant, for the reason that it had a right to know whether the jury were finding the facts in accordance with the evidence, or whether the jury entirely overlooked and ignored the evidence upon a given point when it was all one way; and

whether the jury were applying the law as given by the court to the facts as they found them.

The court was not in error in directing the answer to this question, for, as was well said by the court in directing the answer, "the testimony was all one way." It was shown by witnesses both for plaintiff and defendant, and not disputed, that the whistle was blown after the train left Hartford and before it reached the crossing, and there was no testimony tending in any degree to contradict this. Whether it was blown soon after the train left Hartford, at St. John's crossing, or at some other point on the road, is in dispute; but the question was not directed as to the point where it was blown, but whether it was blown at all after the train left the village. These special questions to the jury are intended for the purpose of a finding upon some particular question of fact in dispute on the trial. *Fowler v. Hoffman,* 31 Mich. 215; *Pigott v. Engle,* 60 Id. 221. There could have been but one answer to the question, and that was the affirmative one, which the court properly directed.

Defendant further requested the court to charge as follows:

"It appears by the testimony on the part of the plaintiff that at the time of the accident the plaintiff was engaged in an unlawful occupation, in that she was driving from a railroad station on Sunday, for pleasure, and not in any work of charity or necessity, and for this reason the defendant is not liable to the plaintiff for injuries resulting from the negligence of its employés."

This question was not presented by the oral argument, but we pass upon it because it is insisted upon in the brief of counsel. How. Stat. § 2015, provides:

"No person shall keep open his shop, warehouse, or workhouse, or shall do any manner of labor, business, or work, or be present at any dancing, or at any public diversion, show, or entertainment, or take part in any sport, game, or play, on the first day of the week. The

foregoing provisions shall not apply to works of necessity and charity, nor to the making of mutual promises of marriage, nor the solemnization of marriages. And every person so offending shall be punished by fine not exceeding ten dollars for each offense."

It cannot be said that under the testimony in this case the plaintiff was engaged in any unlawful enterprise, even within the terms of this statute, in riding from the railway station to her home in a peaceable and quiet manner on a Sabbath evening. If she had been engaged in an unlawful enterprise within the meaning of the statute, she would be subject to the penalty fixed by the statute. In nearly all the states it has been held under quite similar statutes that a party traveling upon the highway upon a Sabbath, either from necessity or for pleasure or business, who is injured by a collision with a railway train at a crossing, is not barred from recovery against the railroad company for its negligence from the fact that the injury occurred on Sunday. *Knowlton v. Railway Co.*, 59 Wis. 278 (18 N. W. Rep. 17); *Jacobus v. Railway Co.*, 20 Minn. 130; *Railway Co. v. Frawley*, 110 Ind. 18 (9 N. E. Rep. 594); *Smith v. Railroad Co.*, 46 N. J. Law, 7; *Carroll v. Railroad Co.*, 58 N. Y. 126. It was held in *Sharp v. Township of Evergreen*, 67 Mich. 443, that—

"A person has the right to travel on a public highway on Sunday for any lawful purpose, and the township charged with the duty of keeping such highway in repair is liable for injuries received under such circumstances, the same as if received on a week-day."

The request was properly refused.

Judgment is affirmed, with costs.

McGRATH, J., concurred with MONTGOMERY, J.

HOOKER, C. J. (*concurring*). To permit the recovery of a judgment for negligence against a railroad company in a case where the injured party drives upon a straight track

in daylight, the circumstances should be exceptional; and, while darkness may reasonably make the use of the senses other than sight the more imperative when approaching a track, the necessity and uniform use of headlights may well lead travelers to expect and rely upon them. In the present case we must assume that the engine and caboose made comparatively little noise, which, if heard, might naturally lead to the inference that it was distant, or upon another railroad, which the absence of a headlight would be likely to confirm. The reflection from the headlight upon the end of the caboose, if where it could be seen, might be equivalent to a headlight, but from the relative directions of the railroad and highway *we* cannot say that it *should* have been seen; that being a proper question for the jury. The inference should not be drawn that absence of light excuses negligence, but under the facts in this case we cannot say as matter of law that the plaintiff did not exercise the care and caution which the ordinarily prudent traveler upon a country highway would have exercised. In my opinion, the circuit judge was right in submitting this question to the jury.

LONG, J. (*dissenting*). I am unable to distinguish this case upon principle from *Mynning v. Railroad Co.*, 64 Mich. 93, and from *Brady v. Railroad Co.*, 81 Mich. 616, and am of the opinion that under the circumstances shown the plaintiff and her party should have stopped and listened before entering upon the track.

In actions for negligent injuries the burden of proof is upon the plaintiff to show that the defendant is entirely responsible for the injuries, and that negligence on the part of plaintiff did not contribute thereto; and negligence on the part of the driver of a team is imputable to the plaintiff under well-settled rules in this State. The evidence in this case shows beyond dispute that the train with which plaintiff collided was making great noise, and

the plaintiff and her party could undoubtedly have heard its approach if they had stopped. The fact that it was so dark a night that one could scarcely see the length of the team necessitated that they should exercise more than ordinary care; and, as said in *Mynning v. Railroad Co.*, *supra*, if it was difficult to distinguish an approaching train, then ordinary care required them to resort to their sense of hearing, and to pause and listen before entering upon this place of danger. This it is not pretended they did do, and I think the court should have instructed the jury that the plaintiff, under such circumstances, could not recover.

GRANT, J. (*dissenting*). I think the court should have directed a verdict in this case for the defendant, on the ground of the plaintiff's own negligence. She, and those who were with her at the time of the accident, testify that the night was very dark; so dark that they had difficulty in finding their team, which had been' hitchéd to the fence by the roadside, to await the arrival of the excursion train upon which two of the party were to come.

The situation of the railroad and of the highway appears in the following diagram, page 318.

The distance from the depot to the crossing along the railroad is a little over a mile; from St. John's crossing, where it is conceded that the whistle was blown, to the crossing is one-half mile; from Anderson's to the crossing, in a direct line, is over half a mile; from the depot to the first bridge is about three-quarters of a mile. Plaintiff and all the members of her party, including the driver, were entirely familiar with the situation. They knew that they were nearing this crossing, which, under all the authorities, is a warning of danger. Trains are liable to approach at any time, and at a high rate of speed. The care to be exercised must be measured by the danger which is imminent. The greater the danger, the greater

must be the care. The question is what care, under the circumstances, the plaintiff and those with her owed to themselves and to the defendant in approaching the crossing. The claim of the plaintiff is that she and her party were not obliged to stop their team and listen, but that they had· performed their whole duty when they looked back, as they were riding along, to see if they could see signs of an approaching train, and had listened, as well as they could, amid the noise made by their carriage and their two horses. If this constitutes in law proper care and prudence on their part, then the verdict should be sustained; otherwise it should not.

The road was gravel, mixed with clay. William Cavanaugh testified that the wagon was making a little rattling on the stones, and, again, that the wheels made a little noise running over the pebbles. Another of plaintiff's witnesses, Mr. Hilliard, said that it was what was called a "gravel road," covered with a gravelly cement; that it packed, and was as hard almost as stone. One of the party, Miss McShannock, testified that the wagon was making no more noise than an ordinary wagon would make. It is apparent that two horses, and a carriage containing four passengers, going over such a road, would make considerable noise, even upon a walk. It is moreover apparent that the only listening done was done while they were engaged in ordinary conversation. One of the party—John McShannock—testified:

"*Q.* What did you do in the way of listening to hear if there was anything coming?

"*A.* Well, we all listened. Wasn't making any great amount of noise talking."

Miss McShannock testified that they chatted and visited until they got within a little way of the track. Mr. McShannock testified that they were engaged in ordinary conversation, and were sometimes laughing. The only evi-

dence that plaintiff looked or listened comes from one of the party, who says:

"I know she looked around,—moved around on the seat. She was looking that way. I don't know whether she did or not. I supposed she did from her movement."

She herself testifies that she remembers nothing that occurred. There is no evidence in the record that they all at one time ceased talking, and listened. It requires but little noise in close proximity to one to prevent hearing another and greater noise at a distance, which would otherwise be distinctly heard. The night was still. There was no intervening object to obstruct the hearing. All the witnesses agree to this. In daylight the train would have been in plain sight of the plaintiff all the way from the village. The little mound or rise of ground was not above the line of vision, and could therefore have formed no obstruction to hearing. If plaintiff could not see, it became her clear duty to stop and listen.

In *Brady v. Railroad Co.*, 81 Mich. 616, the plaintiff was held guilty of negligence in attempting, without stopping and listening, to cross a railroad track so obstructed by intervening objects that he could not see a train approaching from one direction until he was within from 20 to 25 feet of the crossing. In that case plaintiff was alone, and, sitting upon his wagon, was approaching the crossing at a walk, and was looking for a train, which he knew was about due. He testified that he did not hear because the wind was blowing the sound from him. He was held guilty of contributory negligence. It was there said:

"A person familiar with a railroad crossing, having been frequently over it, and knowing its location, when approaching the same is under the highest possible obligation to observe such precautions as are needful to avoid a collision; and failure so to do is contributory negligence that will prevent recovery for damages, if any accrue;" citing *Haas v. Railroad Co.*, 47 Mich. 401.

The highest possible obligation certainly requires the exercise of every reasonable precaution to avoid the danger. It certainly makes no difference in what manner one's view of a railroad near a crossing is obstructed—whether by trees, or embankments, or by intense darkness. The duty in the one case is no other or different than in the other. If Brady, whose view was obstructed by trees, could not recover, on account of his own negligence in not stopping and listening, neither should plaintiff in this case, whose view was obstructed by intense darkness. If there is any difference in principle between the two cases, I am unable to discover it.

It is proven beyond controversy that, had the plaintiff and her party stopped their team and listened at any point within 10 rods of this crossing, they would have heard the approaching train, and the distressing accident would not have occurred. Under the evidence, when they were five rods from the crossing, the train was from 15 to 20 rods therefrom, and, of course, the distance between them and the train was about five rods less. Besides, it is a matter of common experience and knowledge that one can, upon a still night, with nothing to obstruct the hearing or distract the attention, hear an approaching train in time to avoid collision at a crossing. To hold otherwise would be "to fly in the face" of a fact known to all, and to discredit our own senses. What plaintiff's witnesses heard, under circumstances as favorable or more unfavorable, certainly plaintiff must be held able to have heard if she had listened. One Fred F. Allen was driving over this same road on his way home from the depot at the same time, and heard the train when it was 20 or 25 rods distant. He also testified that he had heard the train on still nights, going over this piece of road, when he was a mile away. This witness had his wife and child

with him.  One Orange Hutchins was living at the Anderson place, marked upon the diagram.  He was 20 rods from the train, and after the accident heard the voices at the crossing, half a mile distant.  John Srackengast came to Hartford on the same train, and walked home on this same road.  When at Anderson's he heard the train, and heard the whistle on the St. John's crossing.  Joseph DeVries lived close by this crossing, and was therefore in the same direction from the approaching train as was the plaintiff.  He heard the train come over the bridges.  R. W. Stickney also came to Hartford to meet this train, went into the depot and remained awhile, and when he came out he heard the train going across the bridge three-quarters of a mile distant.  He was more than twice as far from the first bridge as was the plaintiff when nearing the crossing, and more than three times as far from the second bridge.  Henry Thomas was approaching another crossing when this same train came along, and testified that he was driving within 10 or 15 rods of the crossing, when his attention was attracted by the rumbling noise of the train.  The above were all witnesses for the plaintiff. For the defense one August Ament, who lived 70 rods north of this crossing, testified that on a still night he could hear trains crossing these bridges.  The driver, Cavanaugh, testified that when about four rods from the crossing he started his horses from a walk into a trot, but he thinks that they came to a walk when within about two rods of the crossing, and the first knowledge he had of an approaching train was when the horses stepped upon the plank of the crossing, when he "noticed the locomotive loom up."

I think this case is ruled by *Brady v. Railroad Co.*, *supra*.  It is true that in that case Brady knew that a train was about due, but that can make no difference with

the rule. Railroads have the right to run trains out of schedule time, and are constantly doing it. It is the duty of every traveler upon a public highway to approach these crossings with the same care and caution as he would if he had the knowledge that a train was due. When one drives, on a dark night, upon them, without stopping to listen, he is, in my judgment, guilty of gross negligence. He not only disregards his duty towards himself, but his legal duty to those who are traveling upon railroads, for he endangers not only his own life, but the lives of others. See *Grostick v. Railroad Co.*, 90 Mich. 594; *Apsey v. Railroad Co.*, 83 Id. 432; *Pzolla v. Railroad Co.*, 54 Id. 273.

Railroad companies and travelers upon the highway are alike bound to the exercise of great care in approaching these dangerous places. The former are liable if they neglect the statutory signals. But this does not justify the latter in assuming that they will hear these signals without stopping to listen when they cannot see. If these signals were given, and the traveler should drive his team upon the crossing without stopping and listening, he would certainly be guilty of negligence, and liable in damages for all the injury which resulted. Neglect of duty by either does not excuse the negligence of the other. When both neglect this plain duty, both are equally guilty, and neither can recover, because each, by the exercise of proper care, could have avoided the accident. The rule as to care must apply to the citizen in his individual as well as in his corporate capacity.

The rule requiring the traveler to stop and listen when he cannot see is reasonable. It imposes no hardship or inconvenience. A stop of a few seconds would, in this instance, have warned them of the approaching train. Upon what principle of reason or justice can plaintiff and her companions be held excusable for not doing so? They

do not say, nor is it claimed, that they could not have heard the noise of the train if they had stopped. They only say that they believe that they could have heard the whistle and bell without stopping the noise which they themselves were making, and which was under their own control. The plaintiff and her companions ask the jury to believe their opinions that, notwithstanding that the noise made by their horses and carriage and their conversation was sufficient to drown the noise of the train until it struck them, yet it was not sufficient to drown the noise of the whistle and bell, and that they would have heard them had they sounded; and this, too, in the face of her other witnesses, that they heard the train at a much greater distance from the track than was she, and that they also saw the lights upon it.

If one must use all his senses, it is his clear duty to put himself in condition to use them; otherwise he has not complied with the law, which requires him not only to listen, but to listen attentively. The duty to stop and listen is supported by the following authorities: *Railway Co. v. Strommel*, 126 Ind. 35; *Railroad Co. v. Beale*, 73 Penn. St. 504; *Mynning v. Railroad Co.*, 64 Mich. 93; *Chase v. Railroad Co.*, 78 Me. 353; *Flemming v. Railroad Co.*, 49 Cal. 253; *Henze v. Railway Co.*, 71 Mo. 636; *Pence v. Railway Co.*, 63 Iowa, 746; *Merkle v. Railroad Co.*, 49 N. J. Law, 473 (9 Atl. Rep. 680).

Beach on Contributory Negligence says (section 181):

"In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track. A multitude of decisions of all the courts enforce this reasonable rule. It is also so consonant with right, reason, and the dictates of ordinary prudence, and so much in line with the ordinary care which the average of mankind display in the daily routine of. life, that it should seem to be scarcely dependent upon the authority of decided cases in the law courts. The traveler on the highway must even come to a halt for this

purpose; but he is not required to get out of his wagon, and go forward on foot, for the purpose of looking, especially when such a course would not have prevented the collision, but would rather have exposed the traveler to the very peril it was designed to avoid."

In *Mynning v. Railroad Co., supra,* it is said:

" Ordinary care would have required him [the traveler] to at least look up and down the track before crossing; and, if the night was so dark as to make it difficult to distinguish a train approaching, then ordinary care would have called upon him to resort to his sense of hearing, and to pause, if need be, and listen, before entering upon the place of danger."

In *Railway Co. v. Adams,* 33 Kan. 427, plaintiff, in company with others, was riding along the public highway, and drove upon the track without stopping. In that case, as in this, plaintiff's testimony was that she and her companions did not see the train. It was there said:

" It is the duty of a traveler upon a highway, about to cross a railroad track, to make a vigilant use of his senses in order to ascertain whether there is a present danger in crossing.  *  *  *  It is true that the wind was blowing in nearly an opposite direction from which the train was coming, but several of plaintiff's witnesses heard the train, and we have no doubt that, if the plaintiff or Adams had given heed and listened, they would have discovered its approach, and could thus have avoided the accident."

In that case it was proven that the whistle was not sounded 80 rods from the crossing, as required, and the negligence of the defendant was regarded as proven. See, also, *Grippen v. Railroad Co.,* 40 N. Y. 50.

It is said in *Chase v. Railroad Co., supra:*

" The verdict is clearly wrong. The rule is now firmly established in this state, as well as by courts generally, that it is negligence *per se* for a person to cross a railroad track without first looking and listening for a coming train. If his view is unobstructed, he may have no occasion to listen; but, if his view is obstructed, then it is his duty to listen, and to listen *carefully.* And if one is injured at a

railroad crossing by a passing train or locomotive, which might have been seen if he had looked, or heard if he had listened, *presumptively* he is guilty of contributory negligence, and, if this presumption is not repelled, a recovery for the injury cannot be had. * * * This [the obstruction] would make it the traveler's duty to listen, and to listen carefully and attentively. To do this, if riding in a sleigh, and especially if riding in a sleigh with bells attached, it would be necessary to stop his horse; for surely he could not listen carefully and effectually without stopping his horse, and thus stilling the noise of his own team."

This was what was called a "wrecking train." It had been sent out to repair a fallen bridge near by. After repairing the bridge they returned to Hartford, late in the day, to await orders. It arrived at Hartford at about 7 o'clock, where it awaited for an excursion train to pass. The engine and tender were built solid, and the tender was about 10 or 12 feet shorter than the ordinary kind of tenders. The cab projected out over the tender. Defendant's witnesses testified that a red light was hanging from a hook in the center of the back end of the roof of the cab. This is the customary place for hanging a lantern in running backward. There were two white lights on the front of the engine, near the pilot; one light on each side of the caboose, towards the rear end, near the corner; and one on the rear, and near the top. The engine was in front of the train, running backward. Its headlight was burning, and reflected against the end of the car behind it. It was necessary to run the train in this manner, because there was no turn-table between the fallen bridge and the place of the accident. It was not, therefore, negligence *per se* to run this engine backward. This oftentimes becomes necessary. In *Mahlen v. Railway Co.,* 49 Mich. 585, a passenger train was running without a headlight, and this was excluded by the court from the consideration of the jury. Several of the witnesses for

the plaintiff saw the lights upon the train, and in the caboose, where there were several men.

Judgment should be reversed, and a new trial ordered.