SANFORD v. GRAND TRUNK WESTERN RAILWAY CO.

RAILROADS — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE — DUTY TO
STOP, LOOK AND LISTEN.

   Where plaintiff approached the track of the defendant
   railroad company in an automobile, at a speed of seven
   miles per hour, and was unable to discover whether or not
   a train was approaching because of obstructions near the
   track which prevented him from taking an observation,
   and just as he was about to enter upon the tracks he
   observed the approach of an engine which he was too
   late to avoid, though he stopped his car and tried to back
   off the tracks, and it appeared that he might have seen
   the train coming if he had looked at a point ten to fifteen
   feet from the rails, being familiar with the crossing and
   its surroundings, he was guilty of contributory negligence
   precluding him from recovering for injuries that he and
   his wife sustained. It was his duty to stop the car at
   the point where he might have obtained a view of the
   track and ascertained whether or not it was safe, before
   attempting to cross.[1]

   Error to Calhoun; North, J. Submitted January 10,
1916. (Docket No. 80.) Decided March 30, 1916.

   Case by John S. Sanford against the Grand Trunk
Western Railway Company, a corporation, for personal
injuries. Judgment for plaintiff. Defendant brings
error. Reversed; new trial denied.

   *Harrison A. Geer* (*W. K. Williams*, of counsel), for
appellant.

   *F. W. Clapp* and *W. S. Powers*, for appellee.

   In this action, plaintiff seeks to recover damages

---

[1] As to care required of driver of automobile at railroad cross-
ing, see notes to 21 L. R. A. (N. S.) 794; 29 L. R. A. (N.
S.) 924; 46 L. R. A. (N. S.) 702.

resulting from a collision between an automobile in which he and his wife were driving, and a train belonging to the defendant. The accident occurred at a few minutes past 6 on July 30, 1913, at the intersection of South avenue with the defendant's railroad tracks in the city of Battle Creek. The physical situation may be briefly described as follows: South avenue, one of the principal streets of Battle Creek, runs north and south and is an unpaved street 66 feet wide. The traveled part of the roadway is practically level with the rails of defendant's railway. The railway does not cross the highway at right angles, but runs slightly to the north of west and to the south of east. Defendant maintains upon its right of way at this point two tracks, the northerly one of which carries the west-bound traffic. From the north rail of the north track to the northerly limits of the right of way there is a distance of approximately 14 feet 5 inches; from the northerly limit of the right of way and extending southerly toward the rails, a distance of 5 feet, approximately, there is a bank about 2 feet 2 inches in elevation above the height of the rail. Upon this bank in July, 1913, commencing at a distance 40 or 50 feet east of the easterly limits of South avenue, there grew weeds about 5 feet high, which to some extent obstructed the view to the east from South avenue. Near the easterly curb of South avenue there were the following obstructions: At a distance of 7.65 feet from the north rail stood a pole; at a distance of 11.25 feet from the north rail stood a second pole; at a distance of 15.65 feet from the north rail stood a third pole; and at a distance of 19.45 feet from the north rail stood a tree. Each of the three poles and the tree were approximately 1 foot in diameter, but there was an open space of approximately 4 feet between the tree and the first pole, and between the first pole and the second. Located at the northeast corner

of South avenue and the railroad right of way is a one-story building standing parallel with the street, and 24 feet east of the limits of the highway. The southwest corner of the building which is nearest the track is about 14 feet and 5 inches distant from the north rail thereof. Main street lies east of South avenue and is distant therefrom 1,195 feet. Defendant's passenger depot is located about 200 feet east of Main street.

On the day in question, the defendant operated a train consisting of an engine, tender, and caboose over the track in question from its station westerly across South avenue. The train stopped at the station to receive orders, and after a delay of a minute or two, very shortly after 6 o'clock in the evening, started on its journey west. The point from which it started after receiving orders to the point of the collision was approximately 1,400 feet.

The plaintiff, a man 62 years of age, many years ago had himself been an engineer, and in that capacity had operated trains over this particular road. He had lived in Battle Creek many years and was familiar with the South avenue crossing. Approaching the crossing from the north, as plaintiff did, it was impossible to secure a view of the tracks to the east for a distance of 100 feet or more north of the railroad, by reason of intervening buildings located east of the highway. It was the claim of the plaintiff that the defendant operated its train westerly over the crossing where the accident occurred at a high and unlawful rate of speed (20 to 25 miles an hour), and that it failed to give warning of its approach either by the blowing of a whistle or the ringing of a bell. The evidence introduced by plaintiff tending to show negligence in these respects was contradicted by testimony introduced on behalf of the defendant. Counsel for defendant, while not exactly conceding that there

was evidence to go to the jury on the question of defendant's negligence, assert that they do not desire to argue that question in this court, but rest their case solely upon the proposition that they were entitled to a directed verdict upon the ground that plaintiff, under his own testimony, should have been held guilty of such contributory negligence as precluded recovery.

Plaintiff's testimony regarding the manner in which the accident occurred follows:

"As I came down near the Grand Trunk, I slowed up, looking and listening. I could see the flagman's house across the way. When I have been up there before, it was always in the daytime, and there was always a flagman there; but I did not see any there at this time. I looked and listened both ways, and, as I got past where they build the monuments there close down by the track, I think I was running along about six or seven miles an hour, and I see a smokestack through the weeds. There is high weeds there. There was an elevation there from the road up, I should judge two or three feet, and on top of the bank must have been five feet of weeds. I just seen the smokestack there, and when I saw that I put on the emergency brake and stopped. I should judge—we were close to the tracks. The pilot runs over the rails, and the cylinders run further over yet, and I released the emergency brake and grabbed the reverse lever, and got it over as far as neutral toward reversing it, when the engine hit me. I suppose the pilot hit the machine and threw it against the engine. Of course, I don't just recollect, for I was dazed for a few minutes I guess, and then they took us downtown to a doctor. I looked and listened to ascertain whether a train was coming. My view was obstructed by the monuments and tall grass the other side of the monuments and three poles and a tree.

"*Q.* How far north of the track could you see through and observe freight cars?

"*A.* It was a long way up towards Main street, and you could see those cars up through there; I don't know exactly.

"*Q.* Now, as a fact, from 100 feet or so north of the track to within a very few feet of the track, isn't the view entirely shut off?

"*A.* Yes, sir.

"*Q.* From 100 feet north of the track to within a few feet of the track, can you see to the east?

"*A.* You cannot see anything; no, sir. Your view is obstructed by the monument building and the houses along there. This monument building I think is a one-story building; I would not swear to that. There are trees in front of the houses. They were in leaf at that time. When you get to the end of the monument building toward the track, there is a tree and three telegraph poles. I don't know how far apart they were. They are not in a straight line, but in a diagonal position. * * * The west corner of the monument building is about 14 feet from the north rail of the track on which this engine was running. The weeds were between the track and the corner of the building. The weeds came right close to the corner of the building. The bank comes within six or seven feet of the track and then runs off this way (indicating). I should judge the engine was about 75 feet away when I first saw it. I have had experience in judging of the speed of trains. The opportunity I had of judging of the speed of this train was from the time that I saw it and put my foot on the brake and applied the emergency brake, and then threw the machine into neutral. This could not have been more than 2½ seconds anyway. In my opinion the train was running between 20 and 25 miles an hour. It consisted of an engine, tender, and caboose.

"*Q.* Now, state whether or not there was any whistle blown.

"*A.* No, sir; there was not.

"*Q.* State whether or not any engine bell was rung.

"*A.* No, sir; there was not.

"*Q.* Did it make any noise or exhaust steam?

"*A.* No exhaust steam. Had there been any exhaust of steam, I could have seen it and heard it. * * * The bank south of the monument building was between 2 and 3 feet in height, I should judge. The weeds were on top of that bank and within a few feet of the rail. I should judge it was sweet clover. They were thick

weeds, tall and rank. I should judge they were about 5 feet high above the bank. There was a sidewalk on the east side of South avenue. The weeds extended probably 30 feet east. As I am sitting in a machine driving, my eyes are 5 feet 4 inches above the level of the street. From where I would naturally sit in that machine as I am driving, to the end of the springs, is just 7 feet. The springs would extend 19 inches beyond the end of the radiator. * * * I commenced to slow my machine down when I was about 40 feet from the track. I was, at that time, going at a rate of 13 or 14 miles an hour. Then I slowed down to 6 or 7 miles an hour, and I saw the engine."

On cross-examination, he testified:

"*A*. I knew the crossing, yes. I had crossed there several times.

"*Q*. And you knew what view you had of a train approaching from the east at that crossing, didn't you?

"*A*. I knew as much as any one would know. * * * I have never made any test to see how far, standing in the center of South avenue, I could look to the east and see an engine coming along the west inbound main line. I think the street runs north and south. The railroad does not cross the street at right angles. The railroad runs south of east and west of north. I know that the easterly end of the marble works building is considerably further from the rail of the west-bound main line than the west end of that building is. The weeds which I have spoken of were north of the embankment. There were none in the roadbed. They were within 6 or 7 feet of the track. They commenced about two-thirds, or halfway, along this building.

"*Q*. Now, didn't you know, sir, that before you get halfway along that building that there is a side track that leads off that west-bound main line extending in an easterly direction, the side track extending in an easterly direction?

"*A*. Yes, sir.

"*Q*. I want the distance between the south side of the building and where the embankment starts.

"*A*. Some places 6 or 7 feet to the rail.

"*Q*. Is it as much as 6 or 7 feet at the nearest point?

"*A*. Yes, I think so; along about that.

"*Q*. From the building to the embankment?

"*A*. No, from the rail to the embankment.   *   *   *

"*Q*. You knew that your view to the east was more or less obstructed, didn't you?

"*A*. Yes, I knew that I could not see a very long way.

"*Q*. You knew that fact as you were coming down this street?

"*A*. Yes."

One Roy Knowles, a witness sworn for the plaintiff, who was on the defendant's right of way at a point about 300 feet west of the point of collision, testified as follows:

"I could see the engine coming, I could not tell how fast it was coming. I saw the automobile before the collision. I could not say how fast it was going. I saw Mr. Sanford reach for his lever. The automobile was quite a ways from the track when I first saw it, but I could not say how far. The machine was about on the track when he reached for his lever.   *   *   * I saw Mr. Sanford reach for the lever of his machine when it was right on the track, or right up to the track."

At the conclusion of all the testimony, the defendant moved for a directed verdict in the following language:

"Now, if your honor please, I move that your honor direct a verdict in favor of the railroad company for reason that the plaintiff, as a matter of law, was guilty of contributory negligence in the manner in which he came up to the crossing on the evening in question. I do not care to argue the question as to whether the defendant was guilty of any negligence, because that is of no importance if the plaintiff was guilty of negligence. There are no allegations of any gross negligence of defendant, and if the plaintiff was guilty he cannot recover."

The motion was denied by the court, who said:

"I want the record to show that after counsel on the respective sides on a motion to direct a verdict, my opinion is that the case should go to the jury.

While there is nothing in the proof of this case that raises that question, it seems to me that the court ought to take judicial notice of the fact that an automobile cannot be handled nor in such a case governed by the same rules of law that apply to a pedestrian; and that it ought to be a matter of which the court could take judicial notice that it is not a thing that is done by an ordinarily careful and prudent man in driving an automobile to stop in approaching a crossing of this kind; that is not a practical thing to do, or a safe thing to do, because it is a well-known fact that in starting his engine from a standstill there is a great risk of his killing his engine and being left on the track. While that does not appear in this case as shown by the evidence, I think the court might take judicial notice of it to the same extent that it enters into the matter of riding a bicycle and other things of that sort; and so the motion will be overruled, and an exception may appear in behalf of the defendant."

The court submitted the case to the jury under a charge which permitted them to find that the defendant was guilty of negligence under the evidence, and that the plaintiff was free from negligence. With reference to the gross negligence, he charged:

"The question of gross negligence, I take it, is not properly alleged in the declaration, in this case, and certainly there is no proof which would justify recovery upon that theory. So I charge you to entirely disregard the question as to gross negligence, which means, of course, wilful and deliberate injury to a party, because there is no testimony in the case which would justify recovery of the plaintiff upon that theory."

The jury returned a verdict in favor of plaintiff in the sum of $650. Judgment entered thereon is now before this court for review.

BROOKE, J. (*after stating the facts*). The concession of counsel for defendant narrows the issue. It will therefore be assumed that, in the operation of

the train at and prior to the moment of the collision, defendant was guilty of such negligence as would warrant plaintiff in recovering if he himself was free from any negligence which contributed to his injury.

The view of the trial court is sufficiently stated in his reasons for denying the motion to direct. In their brief for plaintiff, counsel say:

"We contend that the facts in this case bring it within the rule, and the line of authorities, that it became a question of fact upon which opinions might reasonably differ, and therefore proper to submit to the jury, whether the plaintiff exercised the common prudence necessary in such cases and might have reasonably believed that it was safe for him to attempt to cross the track under the circumstances as they appeared to him at the time as shown by the evidence in this case.

"We submit it is not the law in this State that a person can be lured to his destruction by the failure of the defendant to give any of the usual and legal requirements to warn such person of the approaching danger, and, when he has used proper precaution to ascertain whether it was safe to cross, that he should be charged with contributory negligence, whether operating an automobile, a pedestrian, or crossing in any manner. If such is the law, the requirement that a railroad company should give any warning is a useless and idle requirement."

Many cases are cited in support of plaintiff's contention. Most of them, however, relate to a situation where the plaintiff, having made an observation while in a place of safety, has seen the on-coming car or train, and has reasonably believed that he could cross the zone of danger in safety in front of the car or train. A good example of this class of cases is *McQuisten* v. *Railway Co.*, 147 Mich. 67 (110 N. W. 118). Another class of cases cited and relied upon by the plaintiff relates to accidents where horse-driven vehicles have come in collision with trains. A good ex-

ample of this line of cases is *Wilbur* v. *Railroad Co.*, 145 Mich. 344 (108 N. W. 713). In the prevailing opinion it is there stated:

"We have the question, then, before us, whether it can be said as a matter of law that, because at a point 21 feet south of the south rail the observer could see in the daytime (when he was there for the express purpose of seeing how far away he could see an approaching train) one could see it, as some of the witnesses say, 12 or 15 rods, and others say perhaps 40 rods, the husband of the plaintiff was guilty of contributory negligence, which may be imputed to her, because upon a cold, stormy night he did not at this point stop his horse and avoid the accident. Account should be taken of the fact that some men do not think as quickly as others. It should not be forgotten that the horse was afraid of the cars. At this point his head was within 10 or 12 feet of where it would be struck by a passing train—a trying situation indeed for both driver and beast. I am not prepared to say that, under such circumstances, we can say as a matter of law the husband was guilty of contributory negligence, because he did not then stop his horse and avoid the accident. The question presented is not one of law, but it is one of fact, namely: Did the driver do what a reasonably prudent person would have done under like circumstances? The circuit judge in a very fair and impartial charge left the question to the jury." (Citing cases.)

The question really presented for determination in this case is whether in approaching a railroad track, a place of known danger, the operator of an automobile should be held to the same degree of care which must be exercised by a pedestrian under the same circumstances. This rule the learned circuit judge frankly declined to apply in the case at bar, and, if he was wrong in that determination, the case should be reversed.

The question is not new in this court. In *Colborne* v. *Railway*, 177 Mich. 139 (143 N. W. 32), which

grew out of the collision between an automobile and a street car, but which in principle cannot be distinguished from the case at bar, this court, speaking through Mr. Justice STEERE, said:

"He could and should have made sure of the safety of proceeding, by looking just before entering upon the track, and at such a point that he could stop his machine if necessary in order to avoid a collision. This rule should be as strictly applied to an automobile as to a pedestrian, and the reasons for its application are more impelling. Usually the careless pedestrian only imperils his own safety.

"In the light of common knowledge, courts can well take judicial notice of the automobile, not only as a most useful and pleasing means of swiftly transporting persons and property for pleasure or business, when properly controlled and cautiously driven, but as a vehicle in its possibilities so destructive, when in the hands of careless and reckless drivers, as to spread over the land the maimed and dead until it has belittled the cruelties of the car of Juggernaut." (Citing cases.)

See, also, *Weil* v. *Railway*, 186 Mich. 614 (152 N. W. 959).

The now almost universal use of automobiles has in recent years resulted in many collisions between such vehicles and street cars or trains, and these in turn have resulted in legal complications which have found their way into the courts. A very recent and well-reasoned case is *New York Central, etc., R. Co.* v. *Maidment*, 168 Fed. 21 (93 C. C. A. 413, 21 L. R. A. [N. S.] 794). The court there said:

"With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have and will continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive, followed by a heavy train,

is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train.   And when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger.   On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety.   When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject.   He cannot drive close to the track, or stop there, without risk of his horse frightening, shying, or overturning his vehicle.   He cannot well leave his horse standing, and, if he goes forward to the track to get an unobstructed view and look for coming trains, he might have to lead his horse or team with him.   These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse.   It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public.   If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized.   In the case of trolleys crossing railroads at grade, the practice is general for the conductor to go ahead and from the track signal the halted car to advance.   This would, of course, be impracticable as a rule for automobiles; but it illustrates the trend of the law, as the size of crossing vehicles makes collision with them more serious, to enforce greater safety precautions.   *   *   *

"The duty of an automobile driver approaching tracks where there is restricted vision to stop, look, and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty, and these safeguarding steps the plaintiff failed to take. He stopped where stopping served no purpose, and failed to stop where stopping would have disclosed danger. He made chance, and not sight, the guaranty of his safety."

See, also, *Glick* v. *Railway Co.*, 124 Md. 308 (92 Atl. 778) ; *Delaware, etc., R. Co.* v. *Welshman* (C. C. A.), 229 Fed. 82.

It is entirely clear from this record that there was a point between 10 and 15 feet from the north rail of the north track where the plaintiff could have observed the on-coming train for a distance of upwards of 1,000 feet. It is equally clear from his own testimony that he did not operate his car in such manner as would enable him when he reached that point to stop his car before it reached the track. Under such circumstances, and under the authorities cited, we are of opinion that the motion to direct should have been granted.

The judgment is reversed, and there will be no new trial.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, and PERSON, JJ., concurred. OSTRANDER, J., did not sit.