## MILLS *v.* WATERS.

RAILROADS — CROSSING ACCIDENTS — AUTOMOBILES — NEGLIGENCE—
QUESTION FOR JURY.

It was a question for the jury whether the driver of an automobile struck at a railroad crossing at night, was guilty of contributory negligence, where it appeared that the freight train which struck plaintiff's car was running backward without lights or signal at the end, that the headlight of the engine was not visible at the crossing, that there· was a clear view except for the darkness for half a mile in each direction, and that plaintiff kept looking for trains and did not see any until he had crossed two tracks and was on the third and last one. STEERE, BROOKE, and FELLOWS, JJ., dissenting.[1]

Error to Gratiot; Searl, J. Submitted June 7, 1917. (Docket No. 5.) Decided December 27, 1917. Rehearing denied March 28, 1918.

Case by James Mills against Dudley E. Waters and Paul H. King, receivers of the Pere Marquette Railroad Company, for personal injuries and damages to his automobile. Judgment for defendants on a directed verdict. Plaintiff brings error. Reversed.

*Charles H. Goggin,* for appellant.

*Parker, Shields & Brown (John T. Mathews,* of counsel), for appellees.

STEERE, J. On November 5, 1915, plaintiff sustained injuries to his automobile and person in a crossing accident at Alma, in Gratiot county, at the intersection of Grover avenue· and Superior street, caused by a backing train of freight cars upon defendants' track

---

[1]As to care required of driver of automobile at railroad crossings, see notes in 21 L. R. A. 794; 29 L. R. A. (N. S.) 924; 46 L. R. A. (N. S.) 702.

striking his automobile. Charging the accident to defendants' negligence, he subsequently brought this action to recover damages, and upon trial a verdict was directed by the court for defendants at the close of plaintiff's testimony, on the ground that he was guilty of contributory negligence in failing to stop, look, and listen before attempting to cross defendants' tracks.

It appears from plaintiff's own testimony that he did not stop his car before attempting to cross, which has been held to be contributory negligence as a general rule; but it is claimed in his behalf that the facts shown here present a recognized exception to that general rule, entitling him to take the verdict of a jury under various authorities cited, *Gorton* v. *Harmon*, 152 Mich. 473 (116 N. W. 443, 15 Am. & Eng. Ann. Cas. 461), and *Van Auken* v. *Railway Co.*, 96 Mich. 307 (55 N. W. 971, 22 L. R. A. 33), being emphasized as particularly in point.

Whether a plaintiff was guilty of contributory negligence is concededly a question for the jury if his testimony, viewed in its most favorable aspect, *prima facie* shows him free from negligence and raises an issue of fact upon that controlling question; and in considering the testimony where a verdict has been directed for defendant the appellate court will only seek to determine whether there is any testimony tending to sustain the burden imposed upon plaintiff to show that he exercised that degree of care and vigilance which a reasonably prudent and cautious man would and should do under like circumstances.

Plaintiff is a farmer, 42 years of age, residing about 3 miles north of Alma. On the day of the accident he had been attending the circuit court at Ithaca, the county seat, where he was serving as a regular juror for the term. While so serving he lived at home, driving to court daily in his automobile. His regular

route was through Alma along Grover avenue, which runs north and south, ending in Superior street just north of where it is crossed by three tracks of defendant. Superior street is the principal east and west business street of Alma, and a main thoroughfare for traffic into Alma from the east and Grover avenue, connecting with it from the south. At this crossing the three tracks of defendant running in a northeasterly and southwesterly direction cross both streets, Superior at an acute angle, and Grover nearly at right angles. The north track is the main line; the two tracks south of it being switch tracks leading to the Michigan Sugar Company's factory, located a short distance to the southwest of the crossing. The two side tracks connect with the main line a little over 280 feet east of the crossing and north of Superior street. From the south rail of the main line in the center of Grover avenue to the south rail of the nearest switch track is 21 feet 11 inches, and to the one farthest south 49 feet. Running from the center of the city easterly along the north side of the railroad to this crossing, Superior street jogs somewhat to the southeast just where the railroad tracks cross it, and then turns more easterly again, running from that point on the south side of the railroad, so that one traveling north on Grover avenue would in passing over the crossing necessarily veer to the west into Superior street when passing over the tracks. Going from the crossing towards his home, plaintiff would turn westerly on Superior street for a short distance, and then north again on a connecting north and south road.

Defendant's line is comparatively straight through this section, and the country sufficiently level that from any point on this crossing a train is visible in daylight for at least half a mile looking east and from a half to three-quarters of a mile looking west. Plaintiff was familiar with the crossing, having passed

over it many times, and had during several seasons crossed it in delivering beets from his farm to the sugar factory.

On the day in question court adjourned shortly after 5 o'clock, and plaintiff started home, accompanied by a neighbor, in his automobile, which was equipped with an electric self-starter, electric lights, service and emergency brakes, and other customary equipment for efficiency. He testified that it was getting dark when they left Ithaca, and he turned on his lights; that coming into Alma from the south on Grover avenue he was running at the rate of about 10 miles an hour, and as he approached the crossing it was so dark he could not see the forms of houses along either side of the street, but could see lights as he drove along, shining from residences and the sugar factory; being familiar with the crossing, he had it in mind, and as he approached it commenced to watch and listen for trains, slowing down his car, partially releasing the clutch with his right foot, and cutting down the feed of his gasoline, so that when he reached the south track he was going at about 4 miles per hour; that Grover avenue, approaching this crossing from the south, is slightly downgrade, so that he was practically coasting, with his car under safe control, and barely enough gasoline applied to avoid being stalled; that under these conditions the wheels and chassis made no noise at all, and the sound of the motor was so slight as not to interfere with his hearing; that he continued to look each way, listening as he looked, saw and heard nothing, crossed the first track yet watching, and, neither hearing nor seeing any sounds or signals or lights indicating an approaching train, continued on. As he came almost to the main track after crossing the two switch tracks, and just as he swung his auto more to the west where the traveled way turned onto Superior street, a man appeared to him

coming from the east on the north side of the main track, who "swung his lantern and hollered 'Stop!'" which was the first plaintiff knew a train was coming, but he was then so near the track he could not do anything. The end car of the train, which was backing slowly, struck his auto just at the rear of the front seat, capsizing and dragging it along for some distance, completely wrecking it, spraining and bruising plaintiff, who fell under it, so that he required the services of a physician and was laid up for some time.

On cross-examination plaintiff testified that the top of his automobile was up, and the wind shield entirely closed; that he had probably slowed down to 5 miles an hour, and, going at that rate of speed, he could stop his automobile with the service brake in 5 or 6 feet; there was a space of 21 feet between the north switch track and main line where he could have stopped in safety and listened without getting out. His engine was making some noise, but not to amount to anything, and his reason for not stopping before going upon the track was:

"I didn't think it was necessary, I guess,   *   *   * because I did not see any train or anything."

He further testified:

"I don't remember that I saw anything after the man called me to stop. I did not see the train at the time it bumped into me, because I was not looking that way; at the time I was looking ahead to see where I was going.   *   *   * As I approached that crossing my lights were shining ahead so that I could see plainly there were three railroad tracks at that crossing. I could not say positively whether I looked east before the front wheels struck the first south rail of the south track. I could not say how many seconds I looked east. I looked the same as a man would look. I could not see anything as I looked to the east there.

198—Mich.—41.

I looked back and forth both ways as I was going across there. I couldn't say where the car was when I looked east again after the first time. I will swear that I looked east again. I looked back and forth as I went across there, same as any man would crossing a railroad track where he knows that there is liable to be cars."

It is undisputed that plaintiff's automobile was struck by the rear car of a switch train consisting of a number of gondola cars and an engine which had gone from the sugar factory east on one of the switch tracks, over the crossing to switch onto the main track along which it was backing slowly westward, with no one stationed at the crossing and none of the train crew upon the end car in the direction the train was moving, nor light or signal at that end. It was moving quietly along at the rate of from 4 to 6 miles an hour, with a brakeman walking on the north side of the rear car carrying a railroad lantern, but concealed by the car from any one approaching from the south along Grover avenue. The engine was some distance away, headed eastward, and its headlight reflected in the opposite direction was not visible at the crossing.

Defendant introduced no testimony. Plaintiff called several who happened to be in that vicinity at the time of the accident. While their testimony is to the effect that it was a dark evening, that the train was moving slowly, not making much noise, and not plainly visible, it is not altogether in harmony with his claim that the train could not be seen and heard as it approached the crossing. One witness testified to hearing the engine whistle and others to hearing or dimly seeing the train before the accident. A boy named Ellison, who was selling papers some distance from the crossing, approximated by him at 15 rods, testified that he could just dimly see the train and heard it rumbling as it approached.

It is very evident that, had the brakeman, who was on the ground behind the rear car, been where he ought to have been, this accident could not have occurred, and it is equally evident that, had plaintiff stopped, looked, and listened just before reaching this well-known, to him, danger line of the main track, as has been many times held to be the duty of the driver of an automobile when his vision is obstructed, he would have escaped injury.

That defendant was guilty of negligence by reason of failing to properly guard the rear of its backing train at the crossing there can be no question; but can it be said from plaintiff's own testimony that there was no negligence on his part? The rule of comparative negligence does not obtain in this State. To recover it was incumbent upon him to affirmatively show he exercised due care and was free from any negligence which contributed to his injury.

Plaintiff was familiar with this crossing, and knew frequent switching was going on there at that season of the year during the sugar beet campaign, and that his route took a right angle turn to the west just at this crossing, to be made in part upon the railroad tracks. He states it was so dark as he approached the crossing that he could see nothing, except by artificial light. His own lamps were lit and shining brightly along the highway before him. He naturally knew that watching the lighted way as he drove both diverted his attention from and blurred his vision to objects not in the light. He sat on the left side, driving his auto with the top up and windshield closed. His companion, who was not called as a witness, sat on his right towards the approaching train. His engine was running, and made some noise, which he minimizes. So situated, he says he looked and listened, and could neither see nor hear anything. Others, his own witnesses, who were not so hampered, both heard and

dimly saw the train a sufficient distance away within which he could have stopped in safety had he seen and heard as they did. He testified that his sight and hearing were normal, he was not in a hurry, and could have stopped his car in 5 or 6 feet, but he guessed it was not necessary, preferred to take the chance rather than the bother of stopping to make it sure, and says, "I was depending for my safety on getting across, I guess."

It is urged for plaintiff that the two cases of *Van Auken* and *Gorton* against railroads, *supra,* are particularly in point as precedent, because the controlling elements constituting exceptions to the general rule were there, as here, that the only obstruction to the traveler's view was darkness of the night, the view being clear and unobstructed in the daytime, and, darkness not being a permanent obstruction, plaintiff could see and hear at all times the customary signals required to be given by trains at crossings, upon which he had the right to rely. In the *Van Auken Case,* containing four opinions, two of which are dissenting, Justice HOOKER in a concurring opinion particularly points out that:

"The inference should not be drawn that absence of light excuses negligence."

In the *Gorton Case* it was claimed that defendant ran its train through the country and across highways at 30 miles an hour without any headlight, which the court pronounced "a most unusual thing," saying:

"It is a matter of common knowledge that trains" so running "almost universally have headlights" throwing "a powerful light ahead," which "can be seen, where" no obstructions intervene, "for a great distance."

While certain things said in deciding those cases may tend in the abstract to support plaintiff's argu-

ment, we do not regard them as analogous to this case in their controlling features. They, with other cases of their class relating to accidents where horse-driven vehicles collided with trains, were before this court when the later cases of *Colborne* v. *Railway,* 177 Mich. 139 (143 N. W. 32), and *Sanford* v. *Railway Co.,* 190 Mich. 390 (157 N. W. 38), were decided, in which this court, with abundant precedent, recognized the increased importance under present conditions of the simple and common sense general rule requiring travelers on highways to stop, look, and listen at railroad crossings in its application to automobiles, because of their capacity for great speed, and resultant speed mania, while they can at the given time be controlled and stopped with ease and certainty.

"The proper application of this rule for one driving an automobile is simple, and in concrete cases far less difficult than for the driver of horses." *Chase* v. *Railroad Co.,* 208 Mass. 137 (94 N. E. 377); citing *Hubbard* v. *Railroad Co.,* 162 Mass. 132 (38 N. E. 366).

A wise, general rule as easily observed as this, particularly by automobiles, ought not to be undermined by exceptions in favor of automobile drivers.

The controlling principles involved here are fully discussed, with citation of authorities, and squarely decided, in the *Sanford Case.* Plaintiff's own evidence discloses that he failed to do the one sure thing to avoid accidents, and made chance the guaranty of his safety, neglecting the easily observed duty imposed upon him by law for both his own and others' safety.

The judgment should be affirmed.

BROOKE and FELLOWS, JJ., concurred with STEERE, J.

MOORE, J. I do not agree with the conclusion reached by Justice STEERE. I think the instant case is clearly distinguishable from the cases which he cites, of *Colborne* v. *Railway,* 177 Mich. 139 (143 N.

W. 32), and *Sanford* v. *Railway Co.,* 190 Mich. 390
(157 N. W. 38). In the first of these cases the car
of the defendant company was lighted, and the lights
could have been seen had the plaintiff looked. In the
last of these cases the accident occurred in the day-
time, and the obstructions were physical, through
which the plaintiff could not see had he looked. In
the instant case there was no obstruction to the line
of vision. If defendant had done its duty by properly
placing its lights, the plaintiff would have seen the
approaching train.

In *Van Auken* v. *Railway Co.,* 96 Mich. 307 (55 N.
W. 971, 22 L. R. A. 33), MONTGOMERY, J., speaking
for the court, said in part:

"Our decisions have settled the law as follows:
"*First.* A railroad track is, in and of itself, a warn-
ing of danger, calling upon one about to cross to use his
senses, and to look and listen for approaching trains.
*Lake Shore, etc., R. Co.* v. *Miller,* 25 Mich. 274.
"*Second.* It is not incumbent in all cases for the
driver to stop his team, if the track is clear, and he
can safely rely on his sense of sight. *Guggenheim* v.
*Railway Co.,* 66 Mich. 158 (33 N. W. 161) ; *Thomas* v.
*Railway Co.,* 86 Mich. 504 (49 N. W. 547) ; *Richmond*
v. *Railway Co.,* 87 Mich. 380 (49 N. W. 621).
"*Third.* As to whether, in a particular case, the
driver is justified in relying upon his sense of sight
alone, must, we take it, depend upon the circumstances
of the case presented.    *    *    *
"In the present case there was no obstruction other
than the darkness, which, of course, would not have
prevented the plaintiff and her companions from see-
ing a headlight. The sense of sight was therefore as
safe a guide as in the daytime, unless it be held that
travelers are guilty of contributory negligence as mat-
ter of law in not anticipating that trains will be run
in the open country without headlights. We think the
law ought not to be so. It is most unusual and extraor-
dinary for this to occur. And we think it should be
at least a question for the jury as to whether a traveler
is in fault in failing to anticipate and guard against

such an unusual thing as the running of a train without a headlight."

In *Morgan* v. *Railroad Co.*, 162 Mich. 573 (127 N. W. 683), BIRD, C. J., said in part:

"We cannot say that reasonably prudent men would not do likewise under similar circumstances. Had there been no willows or underbrush on the right of way, he could have observed the train from his wagon before he reached the track. Had the engine been facing the direction in which it was going, and its headlight lighted, plaintiff might have seen the reflected light on the track in time to stop. Plaintiff had a right to assume that, if there were a train approaching, it would be operated in the usual and customary way; that is, that the customary warnings would be given, and that a headlight would signal its approach. How far plaintiff was misled, if at all, by the failure of defendant to observe these customary methods of operation, we are unable to say. Therefore we think that the question of whether he should have stopped before attempting to go across was a proper question to submit to the jury, together with all the other facts and circumstances in connection with it."

In the case before us the darkness was not an obstruction that would prevent seeing a light in the line of vision, and if the plaintiff took the precautions to which he testified, he would have seen the approaching train, if the trainmen had done their duty by placing proper lights, and no injury would have occurred.

The question of the contributory negligence of the plaintiff should have been submitted to the jury under proper instructions.

The judgment is reversed, and a new trial ordered, with costs to the plaintiff.

KUHN, C. J., and STONE and BIRD, JJ., concurred with MOORE, J. OSTRANDER, J., did not sit.